UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DWAYNE E. TINSLEY,

       Plaintiff,                            Civil Action No. 12-13163

v.                                      HON. DAVID M. LAWSON
                                         U.S. District Judge
                                         HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL          U.S. Magistrate Judge
SECURITY,

       Defendant.

_____/

## <u>REPORT AND RECOMMENDATION</u>

      Plaintiff Dwayne E. Tinsley ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Supplemental Security Income ("SSI") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be DENIED, and that Plaintiff's Motion for Summary Judgment be GRANTED to the extent the case is remanded for further administrative proceedings consistent with this Report and Recommendation.

-1-

## PROCEDURAL HISTORY

Plaintiff, born December 27, 1986 was found disabled and thus entitled to Childhood SSI as of April 16, 1994 (Tr. 12, 112).  On May 31, 2007 the SSA found that because his condition had improved, he was no longer eligible for SSI (Tr. 58).  After his request for reconsideration was denied on June 17, 2008 (Tr. 89), he requested an administrative hearing, held on July 1, 2009 before Administrative Law Judge ("ALJ") James N. Gramenos (Tr. 346).  Plaintiff, unrepresented at the hearing, testified (Tr. 349-353) as did his parents (Tr. 353-372, 373-384).  Vocational expert ("VE") Harry Sinewa also testified (Tr. 385-391).  On May 5, 2010, ALJ Gramenos found that Plaintiff's disability ended as of May 1, 2007 (Tr. 22-23).  On June 6, 2012, the Appeals Council denied review (Tr. 5-7).  Plaintiff filed suit in this Court on July 18, 2012.

## BACKGROUND FACTS

Plaintiff, born December 27, 1986, was 23 when the ALJ found that he was not entitled to adult benefits (Tr. 23, 112).  Plaintiff alleges continued disability as a result of a learning disability and behavioral and cognitive problems brought on by childhood lead poisoning (Tr. 122, 197).

### A.    Hearing Testimony by Fact Witnesses[1]

Plaintiff's mother, Valeria Tinsley, reported that she had not been able to procure recent psychological treating records, adding that her son had received treatment since 2008

---

[1]Plaintiff's parents both testified.  Plaintiff offered little testimony on behalf of his disability claim.

-2-

(Tr. 353, 357).   She alleged that her son experienced "constant[]" anxiety attacks, characterized by shaking and loss of consciousness (Tr. 360).  She acknowledged that such symptoms were limited to times when Plaintiff ran out of medication, noting that she experienced difficulty procuring medication refills (Tr. 360).  She stated that she was happy with his current social worker (Tr. 362).

Ms. Tinsley testified that on a typical day, Plaintiff did not arise until the early afternoon and retired at "ten or eleven" (Tr. 363-364).  She stated that he overslept due to the use of prescribed medication and spent most of his waking hours watching television (Tr. 364, 367).  She reported that Plaintiff's adult sister would occasionally give him a ride to her house where he visited with the sister's children (Tr. 370).   Ms. Tinsley indicated that Plaintiff interacted with her husband regularly (Tr. 372).

Plaintiff's father, Charles Styles, testified that Plaintiff was unable to work due to poor communication and reading skills and mental deficits (Tr. 375-376).   Mr. Styles acknowledged that Plaintiff had not sought out reading programs, but noted that on one occasion, he attempted to help his son develop better comprehension skills with little success (Tr. 377-378).  Mr. Styles reported that in addition to watching television, Plaintiff would sometimes take a 20-minute walk to his sister's house or spend his evening hours drawing (Tr. 378).  He denied that a private psychologist or psychiatrist had been engaged to treat Plaintiff (Tr. 381).

**B.     Medical Evidence[2]**

**1. Treating Sources**

In August, 2007, Plaintiff sought emergency treatment for neck pain and again in December, 2007 for eye irritation (Tr. 280-282). In both cases, he appeared fully oriented with an appropriate affect (Tr. 280, 282).

In May, 2008, Plaintiff began psychological treatment at Northeast Guidance Center ("NEGC"). Plaintiff reported that he wanted to be an artist, but had anger management problems (Tr. 287). NEGC staff observed that Plaintiff exhibited good communication skills and was compliant with medication (Tr. 287). Plaintiff reported recent marijuana use (Tr. 290). Staff notes state that Plaintiff's mother "reported that she [was] trying to get her SSI back and that is why she brought [Plaintiff] here" (Tr. 291, 333). Plaintiff reported that he had just ended a relationship with his "SO" (significant other) (Tr. 291, 333). The same month, treating notes state that Plaintiff did not participate in the session, but instead sat with "an odd smile on his face" (Tr. 298). He exhibited good grooming (Tr. 298). He was assigned a GAF of 50[3]  (Tr. 295). August, 2008 treatment notes state that Plaintiff denied hallucinations or homicidal ideation (Tr. 301). Plaintiff was currently prescribed Ambilify

---

[2]Medical evidence predating the period under consideration has been reviewed in full but is omitted from the present discussion.

[3]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* )(4th ed.2000).

-4-

(Tr. 303).  Treating notes also state that Plaintiff did not have a guardian (Tr. 304).  Daniel Appel, D.O.,  assigned Plaintiff a GAF of 30[4] (Tr. 306).  He  deemed Plaintiff a danger to others with "potential for violence" (Tr. 304).  October, 2008 notes state that Plaintiff had missed appointments and been non-compliant with medication use (Tr. 308).  In January, 2009 Dr. Appel deemed Plaintiff's account of his medication use "manipulative" (Tr. 309).  Plaintiff admitted that he had not "heard voices" since he was "real young" (Tr. 309).  The same month, Plaintiff sought emergency treatment for anxiety (Tr. 276).  The following month, Dr. Appel deemed Plaintiff's account of his medication use "manipulative and unreliable" (Tr. 313, 323).  In April, 2009, NEGC staff notes state that Plaintiff reported "great" results from his current medication (Tr. 314).  August, 2009 treating notes state that Plaintiff had "no interest in working" but that his life was going "all right" (Tr. 320).  He reported that he had some "good friends" (Tr. 321).  Social worker Leslie Bouldes recommended that Plaintiff continue outpatient treatment (Tr. 322).

### 2.  Consultive and Non-treating Sources

Results of a March, 2007 "Speech-Language" consultive examination performed on behalf of the SSA note a personal history of lead poisoning diagnosed at the age of three or four and "behavioral/emotional" problems (Tr. 197).  Results of an audiological assessment were unremarkable (Tr. 197).   Plaintiff's mother reported that her son was in special

---

[4]A GAF score in the range of 21-30 is associated with "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas. " *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-TR*" ) at 34 (4th ed.2000).

education throughout high school and had no friends because of anger management problems (Tr. 198). She stated that Plaintiff talked to himself and experienced visual hallucinations (Tr. 198). Plaintiff expressed no interest in obtaining a driver's license (Tr. 198). He did not exhibit speech problems (Tr. 199). His listening comprehension skills and oral expression skills were placed in the first percentile (Tr. 199). He was diagnosed with "severe receptive language" and "severe expressive language" impairments (Tr. 199-200). Plaintiff received a guarded diagnosis (Tr. 200). The assessor recommended that the findings be compared to medical, psychological, and cognitive findings (Tr. 200).

The following month, J. Qadir, M.D., performed a consultive psychiatric examination of Plaintiff, noting that Plaintiff's father reported that his son experienced "mood/attitude problems" (Tr. 218). Plaintiff currently took allergy medication but was not seeing a psychiatrist or taking psychotropic medication (Tr. 218). Plaintiff appeared cooperative with good eye contact (Tr. 219). He reported that he enjoyed watching movies (Tr. 219). He recalled three of three objects after three minutes, but could not explain what the adage "[d]on't cry over spilled milk" meant (Tr. 219). Dr. Qadir assigned Plaintiff a GAF of 47 with a "guarded" prognosis, noting that "borderline intellectual functioning" should be "rule[d] out" (Tr. 220).

The same month, a non-examining Psychiatric Review Technique performed on behalf of the SSA found the presence of organic and affective disorders (Tr. 226, 227, 229). Under the "'B' Criteria," the assessor found moderate restriction in activities of daily living and concentration, persistence, or pace (Tr. 236). The assessor noted that 2004 IQ tests

-6-

showed a verbal IQ of 65, performance IQ of 72, and full scale, 66, commenting that Plaintiff's "effective functioning is borderline to low average" (Tr. 238).  A Mental Residual Functional Capacity Assessment created the same day states that Plaintiff experienced moderate limitations in the ability to understand, remember, and carry out detailed instructions; maintain attention for extended periods; interact appropriately with the public; and set realistic goals (Tr. 223).  The Assessment concludes by stating that Plaintiff "retains the mental capacity to do "simple unskilled tasks" (Tr. 224).   Case analysis notes from the following month note that past IQ scores were consistent with mild mental retardation but that school "evidence" instead supported a diagnosis of learning disability with behavioral problems (Tr. 245).

In November, 2007, R. Hasan, M.D. performed a consultive psychiatric evaluation on behalf of the SSA (Tr. 248).  Plaintiff's mother reported that Plaintiff had a bad temper and was prone to violence and property destruction (Tr. 246).  She stated that Plaintiff saw "green shadows" and believed that he was being followed (Tr. 246).  Plaintiff appeared calm during the interview but smiled at inappropriate times (Tr. 247).  He appeared fully oriented but professed to not know his birth date (Tr. 247).   Dr. Hasan assigned Plaintiff a GAF of 39[5] with a guarded prognosis (Tr. 248).  The same day a consultative physical examination performed by Bina Shaw, M.D. on behalf of the SSA was unremarkable (Tr. 249-255).  Dr.

---

[5]

A GAF score of 31-40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *Diagnostic and Statistical Manual of Mental Disorders* at 34 ("*DSM-IV-TR*")(4th ed.2000).

Shaw observed that Plaintiff was fully oriented and was able to "tell birth date and current President's name" (Tr. 250).  Dr. Shaw opined that a neuropsychological exam was required "for IQ evaluation" (Tr. 251).

In January, 2008, Zahra Yousuf, M.D. completed a Psychiatric Review Technique, finding the presence of organic and psychotic disorders (Tr. 258-260).  Dr. Yousuf found the presence of moderate deficiencies in concentration, persistence, or pace (Tr. 268).  Dr. Yousuf also completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff experienced moderate limitations in the ability to understand, remember, and carry out detailed instructions; complete a workweek without psychologically based interruptions; interact appropriately with the public; maintain socially appropriate behavior; and set realistic goals (Tr. 272-273).  Dr. Yousuf, noting that Plaintiff was "selectively mute," found that he could nonetheless complete simple unskilled tasks on a sustained basis (Tr. 274).

### C.    Vocational Expert Testimony

VE Harry Sinewa testified that Plaintiff had no work history (Tr. 386).  The ALJ then posed the following question to the VE, taking into account Plaintiff's age and education:

> During a normal eight hour work period, assuming normal breaks and meal period during the work period, the hypothetical individual has the following specific mental and/or physical functional capabilities and functional limitations . . . . The hypothetical individual is able to communicate in the English language, can speak and understand the English language, unable to communicate . . . effectively in writing or reading the English language . . . . Has the specific basic mental ability to . . . understand, carry out and remember simple unskilled work instructions.  The hypothetical person has the mental functional ability to respond appropriately to supervision when performing unskilled work activity, has the mental functional ability to respond appropriately to usual work situations and with co-workers when performing

-8-

unskilled work activity.  The hypothetical worker has the mental functional abilities in dealing with changes in a routine unskilled work setting. The hypothetical worker has the mental functional capacity to engage in unskilled work activity that does not require exposure to high levels of stress [defined as] occupations that require working with the general public or an actual moving line job and not a bench assembly type job.  The hypothetical worker has the functional mental ability to learn to perform simple one step to up to a three step unskilled work task. (Tr. 386-389).

The VE replied that given the above limitations, the hypothetical individual could work as a visual inspector checker (1,000 positions in the regional economy); small products assembler (2,500); and hand packager (2,500) (Tr. 389-390).   He stated that his testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT"), adding that he also relied on information provided by information provided by Michigan Department of Career Development and his own professional experience (Tr. 390-391).

**D.  The ALJ's Decision**

Citing the medical records, ALJ Gramenos determined that Plaintiff experienced the severe impairments of "learning disorder by history; and a speech and language disorder but that neither impairment met nor medically equaled one of the impairments found in 20 C.F.R. Part 404 Appendix 1 Subpart P (Tr. 16-17).

The ALJ found that Plaintiff had the following Residual Functional Capacity:

 [S]ince May 1, 2007, claimant has had the reisdual functional capacity to perform a limited range of work activity.  Claimant has the following 'non-exertional' limitations as well as functional abilities: (1) able to speak, understand and communicate in the English language; (2) not able to communicate effectively in either writing or reading material; (3) limited to unskilled jobs that would require little or no judgment and can be learned in a short period of time; (4) can speak and understand the English language with

the mental functional capacity to engage in unskilled work activity; (5) has the specific basic mental abilities to understand, carry out and remember simple unskilled work instructions; (6) has the mental functional ability to respond appropriately to supervision when performing unskilled work activity; (7) has the mental functioning ability to respond appropriately to usual work situations, and with co-workers, when performing unskilled work activity; (8) has the mental functional abilities in dealing with changes in a routine unskilled work setting; (9) hypothetical worker has the functional mental ability to learn to perform simple one step to up to a three step unskilled work task[]; (10) has the mental functional capacity to engage in unskilled work activity that does not require exposure to high levels of stress.  I define high levels of stress such as would be expected in occupations that require working with the general public, or an actual moving assembly line job and not a bench assembly type job (Tr. 19).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the work of a small parts assembler, visual inspector/sorter, and hand packager (Tr. 22).

The ALJ discounted the allegations of continuing disability, noting that while the evidence showed some "speech and language problems . . . up to March, 2007 . . . later evidentiary documentation [does not] identify the extent of any purported language difficulties" (Tr. 20).  He cited May, 2008 treating notes stating that Plaintiff had good communication skills and wanted to work (Tr. 17).  He noted that April, 2009 treatment records state that Plaintiff reported good results from medication (Tr. 17).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more

than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## **FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence,

whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes three arguments for remand.  *Plaintiff's Brief* at 14-20, *Docket #12.*. First, he contends that the ALJ erred by failing to discuss August, 2008 findings made by Dr. Appel, a treating psychiatrist. *Id.* at 14-15.  Second, he argues that the ALJ did not fulfill his "heightened duty" to develop the record as required in cases where a claimant is unrepresented.  *Id.* at 16-19 (citing *Lashley v. Secretary of Health and Human Services* 708 F.2d 1048, 1051 (6th Cir.1983)).  Third, he argues that the ALJ's findings were not supported by substantial evidence.

### A.  The Treating Physician Rule

Plaintiff is correct that "if the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given

controlling weight." *Hensley v. Astrue, 573* F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544  (6th Cir. 2004)); 20 C.F.R. § 404.1527(c)(2).  He faults the ALJ for failing to consider Dr. Appel's August, 2008 diagnoses of psychotic and antisocial personality disorders.  *Plaintiff's Brief* at 15.

In response, Defendant points out that these findings were made by Dr. Appel at an initial evaluation.  *Defendant's Brief* at 7-8, *Docket #16.*  Thus, at the time of the evaluation, Dr. Appel's could not be considered a "treating source" for purposes of  20 C.F.R. § 404.1527(c)(2).  In reply, Plaintiff argues that Dr. Appel's subsequent treatment and status as a "treating source" entitles the August, 2008 findings to deference.  *Reply* at 3.

Because Dr. Appel made these observations in the course of an initial evaluation, they are not entitled the deference accorded to a treating source.  *See Kornecky v. Commissioner of Social Security,* 167 Fed.Appx. 496, 506, 2006 WL 305648, *8 (6th Cir. February 9, 2006)("relevant inquiry . . . not whether [the treating physician] might have become a treating physician in the future, but rather, whether [he] had the ongoing relationship . . . *at the time he rendered his opinion.*" *Id.* (emphasis in original).   I disagree with Plaintiff's contention that *Kornecky* is distinguishable because the one-time examiner in that case was originally hired to perform only a consultative examination.  Whether the initial examination was contemplated as a one-time examination or, performed in anticipation of a treating relationship, is irrelevant to the fact that a "treating source" opinion is entitled to weight because of  the  source's  "longitudinal  picture"  of  the  impairment(s).    20  C.F.R.  §

404.1527(c)(2)(i)("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source"). Regardless of  Dr. Appel's subsequent relationship with Plaintiff, at the time of the evaluation he had only examined Plaintiff once.

Further, Dr. Appel's subsequent findings undermine, rather than support, the disability claim.  In January, 2009, Dr. Appel noted that Plaintiff's account of his psychotropic drug use was "manipulative," noting further that Plaintiff backed away from his previous claims of hallucinations by conceding that he had not heard voices since he was much younger (Tr. 309).  The following month, Dr. Appel found Plaintiff "manipulative and unreliable" (Tr. 313).  Observations by other NEGC staff member do not support the disability claim.  May, 2008 notes state that Plaintiff had just broken up with a "SO" or significant other, suggesting at the very least that Plaintiff did not lack the emotional and social skills to sustain a romantic relationship.  (Tr. 291).  Although Plaintiff's parents alleged disability as a result of antisocial behavior and cognitive disorders, neither applied for guardianship rights (Tr. 293, 304).  Plaintiff reported that he had some friends but had no interest in working (Tr. 320).  Moreover, because the administrative opinion otherwise contains an adequate of summation of treating records, remand on this basis is unwarranted.

**B.  The ALJ's "Heightened Duty"**

Plaintiff, noting that he was unrepresented at the administrative level, argues that the ALJ did not abide by his heightened duty to develop the record. *Plaintiff's Brief,* at 16-19.

-14-

First, he contends that the ALJ erred by failing to elicit "details at the hearing regarding the nature, frequency, duration, or intensity" of the cognitive and psychological symptoms. *Id.* at 16. He contends that Plaintiff's mental and emotional symptoms prevented him from being an effective witness on his own behalf. *Id.* at 16-17. Second, he contends that the ALJ ought to have ordered additional psychological testing to determine if Plaintiff's IQ supported a diagnosis of mental retardation. *Id.* at 18.

Although an ALJ cannot properly assume the role of counsel, "[h]e acts as an examiner charged with developing the facts." *Lashley, supra,* 708 F.2d at 1051; *Richardson v. Perales,* 402 U.S. 389, 411 91 S.Ct. 1420, 1432, 28 L.Ed.2d 842 (1971). Where a claimant is unrepresented at the hearing, "the ALJ has a duty to exercise a *heightened* level of care and assume a more active role" in the proceedings. *Lashley* at 1051 (emphasis added)(*citing Smith v. Harris,* 644 F.2d 985, 989 (3d Cir.1981)). The ALJ is permitted but not required to order consultative testing if necessary to fully develop the record. *Foster v. Halter,* 279 F.3d 348, 355 (6th Cir. 2001)(citing *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.1986)); 20 C.F.R. § 416.917.

In response to Plaintiff's first assignment of error, Defendant points out that the ALJ "scheduled three hearings[,] spoke with Plaintiff and his parents on all three occasions" and provided information on obtaining representation (Tr. 400-416). *Defendant's Brief* at 12 (citing 346-434). Defendant points out that after Plaintiff testified that he did not know why he could not work, the ALJ questioned Plaintiff's parents at length. *Id.* Defendant also notes that after the ALJ determined that recent treating records had not been submitted, he

-15-

kept the record open until they had been received.  *Id.*  My own review of the transcript shows that the ALJ expended considerable effort in ensuring that Plaintiff received due process.

Further, Plaintiff's testimony that he did not know why he was disabled and nothing more, read against the rest of the transcript (including observations that he was "selectively mute," and "manipulative") made the ALJ's task more difficult. [6] (Tr. 274).  The multiple failures of Plaintiff and his parents to take simple steps to either procure counsel or timely provide the ALJ with treating records also shows that the failure to develop the record was largely attributable to their own shortcomings.[7]  While Plaintiff asserts that the ALJ did not elicit testimony concerning behavioral problems, anxiety attacks or medication side effects, the record shows that Plaintiff's mother provided testimony concerning all three issues (Tr. 360-367).  While Plaintiff's mother testified that Plaintiff experienced the medication side effect of drowsiness, the treating records do not support her testimony (Tr. 364).  Plaintiff's mother admitted that Plaintiff did not experience anxiety when taking psychotropic medication (Tr. 360).  Treating records also support the finding that  Plaintiff reported good

---

[6]At an examination ordered for the purpose of evaluating his psychological condition, Plaintiff claimed not to know his birth date, but at a *physical* examination conducted the same day, was able to recite his birth date without prompting (Tr. 247, 250).

[7]Notwithstanding ALJ Gramenos' long-term efforts to ensure that Plaintiff's claims were fairly considered, he was perhaps needlessly brusque with the fact witnesses. He told Plaintiff's mother to stop "chang[ing] the story;" suggested that Plaintiff's parents were enabling their adult children; and opined that Plaintiff's unmarried sister had too many children (Tr. 361, 366, 375, 380).

results when taking psychotropic medication as directed (Tr. 314, 364).

However, Plaintiff's argument as to the need for updated intelligence testing fares better. He notes that multiple consultative sources recommended neuropsychological testing for the purposes of determining whether he experienced borderline intellectual functioning or mental retardation (Tr. 220, 251). In response, Defendant argues that even assuming that Plaintiff could establish a diagnosis of mental retardation requiring "a valid verbal, performance, or full scale IQ of 60 through 70," he cannot meet the additional requirements for a disability finding at Step Three of the sequential analysis. *Defendant's Brief* at 15-16; 20 C.F.R. Pt. 404 Subpt. P, App. 1, § 12.05(C)(mental retardation).[8]

The presence of a critical gap in the records points to the need for additional consultive testing. 20 C.F.R. § 416.917. In Defendant's favor, past intelligence testing (as noted by the ALJ) pointed toward a finding of borderline intelligence or a learning disability accompanied by behavioral problems rather than mental retardation (Tr. 220, 224, 245). Nonetheless, Defendant's arguments fail for two reasons: First, at least three consultative sources have stated that their clinical observations/testing were insufficient to fully assess

---

[8]

Listing 12.05 requires a showing of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22" along with "(C) [a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."

-17-

Plaintiff's mental deficiencies and/or suggested the need for cognitive testing (Tr. 200, 220, 251). The latest intelligence testing, performed while Plaintiff was still in high school, would establish mental deficiencies prior to the age of 22 as required by Listing 12.05 but is only partially insightful into his current condition (Tr. 201); fn 8, above. Second, even assuming that Plaintiff cannot establish disability as a result of mental retardation at Step Three, such a diagnosis would potentially change the ALJ's choice of hypothetical limitations and the VE's job findings. While Defendant notes that the diagnosis of borderline intelligence, as suggested by some non-treating sources, is a distinct from mental retardation, this argument cuts both ways: A diagnosis of mild mental retardation could impact the Step Two findings, RFC, and hypothetical question to the VE. For this reason, a remand for the purpose of ordering intelligence testing as allowed pursuant to 20 C.F.R. § 416.917 is warranted.

### C. Substantial Evidence

Aside from the above-discussed need for additional testing, Plaintiff's argument that the ALJ's decision was not supported by substantial evidence does not present grounds for remand. *Plaintiff's Brief* at 19-20. Plaintiff's contention that the ALJ ought to have included all of the limitations found in Section I of the January, 2008 Mental Residual Functional Capacity Assessment is directly contradicted by Program Operation Manual System ("POMS") DI 24510.060(B)(2)(a) which states that "Section I of the [Residual Functional Capacity Assessment] is "merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute

the RFC assessment." Instead, the ALJ properly cited Section III of Dr. Yousuf's assessment, which stated that Plaintiff could perform "simple unskilled tasks on a sustained basis" (Tr. 274) after all of the limitations in Section I. had been taken into account. *Id.* Moreover, the argument that the hypothetical question must contain a recitation of the claimant's discrete limitations has also been rejected by the Sixth Circuit. *See Webb v. CSS,* 368 Fed. 3d 629, 632 (6th Cir. 2004); *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir.2001).

Plaintiff's additional argument that the ALJ failed to cite all of the evidence supporting the disability claim does not provide grounds for remand. *See Kornecky, supra,* 167 Fed.Appx. at 507-508, *8–9 (*citing Loral Defense Systems–Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999))("'While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each ... opinion, it is well settled that an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party'").  Because the administrative opinion contains an accurate and detailed summation of the treating and non-treating evidence, remand on this basis is unavailable.

While Plaintiff also argues that allegations of psychiatric limitation ought to have been included at Step Two, Defendant correctly points out that the psychological limitations supported by substantial evidence were addressed in the RFC and the hypothetical question precluding high stress jobs, working with public, and assembly work (Tr. 386-389). *See Pompa v. Commissioner of Social Sec.*, 73 Fed.Appx. 801, 803, 2003 WL 21949797, * 1 (6th

-19-

Cir. August 11, 2003)(a Step Two omission of "little consequence," provided that the ALJ consider "all impairments, severe and non-severe," in crafting the RFC).

In closing, I note that while the above-discussed gaps in the record present grounds for remand  to obtain intelligence testing, Plaintiff has not established an "overwhelming" case for benefits. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir.1994). The ultimate decision is best entrusted to the ALJ on remand.  I therefore recommend that the case be remanded for further administrative proceedings rather than an award of benefits. *Id.*

**CONCLUSION**

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be DENIED, and that Plaintiff's Motion for Summary Judgment be GRANTED to the extent the case is remanded for further administrative proceedings consistent with this Report and Recommendation.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with

specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: August 27, 2013                  s/R. Steven Whalen
                                         R. STEVEN WHALEN
                                         UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on August 27, 2013, electronically and/or by U.S. mail.

                                         S/Michael Williams
                                         Case Manager for the
                                         Honorable R. Steven Whalen

-21-